Judge Mills
delivered the opinion.
William M’Bride being entitled to a settlement of four hundred acres of land, styled in this record as a name of description, Buntin’s settlement, sold and gave his obligation to John Buntin, on the 10th of October, 1781, with a penalty in the usual form, conditioned “to make or to cause to be made to said Buntin, a good and lawful deed or title, for a certain tract of land in Lincoln county, containing two hundred acres, being the place where said Buntin then lived, and laid of by James Hord, deputy surveyor. The title to be made so soon as it could reasonably be done, after the emanation of the patent.” James Hord, the surveyor alluded to in the bond, had made a survey of the ground on the thirteenth of the preceding March, and had delivered to the parties a plat and certificate of the survey, which reads in the following words:
“This survey contains 200 acres of land, lying adjoining the lands of Azor Rees, Edward Bulger, and the land surveyed for Hubbard Taylor, and is the property of John Buntin, it being part of a survey of 400 acres, made for William M’Bride, assignee of said Buntin, situate and bounded as follows, viz: beginning at two ash trees and peawood, south east corner of said Rees’ land, in Taylor's line, running from thence with Rees’ line west 130 poles, to a sugar tree in Bulger’s line; thence with said line, south 2301-2 poles, and corner in the same, to two ash trees and sugar tree; thence east 147 poles to a small walnut and *505 two ash trees; thence north 1101-2 poles to an ash and hoopwood, a corner of said Taylor's land; thence west 17 poles to a small walnut and cherry tree, another of said Taylor's corners; thence north, with another of Taylor's lines 120 poles to the beginning.—March 30, 1781.
Signed, James Hord, d. s. l. c.
This was the same survey intended by the parties, and referred to in the afore recited bond. The patent for the whole settlement issued to McBride in 1782. Buntin continued upon the land, claming under the aforesaid bond, & without a conveyance, till be sold the land and assigned the bond on the 29th of October, 1784, to John Hord, who took and held the possession till the 18th April, 1786, when he sold the land and assigned the bond to James Hord; who after living on the land for some time, sold it, and assigned the bond to David, Mosby, on the 4th of August, 1789.—David Mosby continued to live upon the land and hold the bond till after the death of M’Bride, the obligor. On the 26th of February, 1798, a deed having been prepared for William & Lapsley M'Bride, the two heirs and devisees of M’Bride, the elder to execute, corresponding in all things with the before recited field notes James Hord, William M’Bride one of the heirs and his wife executed it, but the other never did, and the deed has remained without further execution ever since. Mosby continued to live upon the land till his death, and in his till directed his executor to sell the land, who, accordingly, on the 10th March, 1808, exposed the land to sale at public auction, when Horace Smith became the purchaser for the sum of 1,500 dollars, and gave bond with Robert Mosby as security according to the conditions of sale. These conditions, and the advertisement represented the tract to contain, two hundred acres, according to the deed from W. M’Bride the younger, and the field notes of Hord In the mean time, William and Lapsley M’Bride, the two heirs of William M'Bride the elder, disposed of the residue pf the tract, called Buntin’s settlement, after Buntin’s bond was deducted, in the following manner. They procured a private surveyor to run the division line between them, assigning to each a moiety, and without a deed, or any further measures of partition, Lapsley M’Bride sold & conveyed his half to Michael Hamble, who sold and conveyed the same to Cyrus Davis, whose heirs still possess it, William M’Bride the younger, sold and conveyed his moiety to Jesse Roberts, who sold and *506 conveyed it to Isaac Shelby. This is the tract immediately adjoining the aforesaid tract sold by the executor of David Mosby to Horace Smith, and designated in the bond of M’Bride the elder, and is of course directly involved in this controversy.
Horace Smith, the purchaser from the executor of David Mosby, paid a considerable portion of the purchase moneys and bought out the dower of the widow of David Mosby. But he at length discovered that the quantity he had purchased was misrepresented. That when it was surveyed according to the boundaries by which it was supposed to be bounded, or those to which the holders of the adjoining land, contended to confine him, it fell short of 200 acres, by upwards of thirty, and he refused payment of the residue, and being sued, and a judgment obtained against him and his security, he filed this bill enjoining a proportion of the purchase money, and alledging that he had bought for 200 acres, and that the quantity was deficient. If he was to be confined to what was supposed to be the ancient boundary, in that event he prayed a proportionate abatement of the price. But be also suggested that the boundary was uncertain, and prayed that, if boundary could not be shewn, the corners and distances should be taken from those corners that were acknowledged, and his boundaries be thus extended the proper length of the lines on Shelby or Davis, and his quantity thus be obtained. To this bill he made Shelby Roberts, Davis, Hamble, M’Bride’s heirs, the heirs of James Hord, the heirs of John Hord, Buntin’s heirs defendants, and Mosby’s executor. The defendants who claim the residue of Buntin’s settlement by purchase from McBride’s heirs, all claim that they purchased for a valuable consideration, and have completed their purchases, having no knowledge of a mistake existing in the survey of Buntin, as claimed by the complainant, or that there was any deficiency in the land, and deny any boundaries outside of what has been long acquiesced in, and rely on lapse of time to quiet their respective claims. The circuit court by its decree determined on an extension of the boundary on the lands of Shelby, and decreed enough to the complainants to make up the deficiency out of that part included in the deeds from Roberts to Shelby, and from M’Bride to Roberts—and dissolved the injunction of the complainant in-that court with damages. To reverse which decree the defendants, Shelby & Roberts prosecuted their appeal, *507 as well as the complainants who prayed their separate appeal.
A defendant conveying the subject matter in dispute lis pendens and without reason, does not thereby, render himself a competent witness, tho' he takes a bond to indemnify him from costs.
The court below seems to have considered this bill in the nature of one to extend and quiet boundary, and that the extension decree was but fixing the boundary of the original tracts; for no decree is entered that Shelby should convey, but the corners all extended into his deed, and M’Bride’s heirs are directed to convey to the defendant, Mosby's executor, and he to the complainants, the heirs of Horace Smith, he having died preceding the suit. Thus Shelby must be considered as holding no title, which he is decreed to release. If the bill is to be thus considered, it is evident that the enquiries, was there an original boundary to Buntin’s purchase from M’Bride? If there was, has it been truly ascertained and fixed on by the court below? become very important in this controversy. To ascertain this, much attention has been bestowed upon the evidence and facts in the court. Before, however, this court proceeds to enumerate the facts, which decide this question, it will be necessary to notice one or two objections to evidence which were sustained by the court below, which evidence was offered on the facts of boundary The evidence offered by Roberts, and objected to on the part of the complainants, and the defendant, Mosby’s executor, is contained in the deposition of Isaac Shelby and Robert Mosby, and they were rejected accordingly. Shelby was the holder of the estate at the time this suit commenced, which estate was to be affected by the contest, and he was accordingly sued, and process was executed against him, and he answered defending the estate. Afterwards he conveyed the land to his son-in-law and daughter, by deed of gift, without recourse, and the son-in-law indemnified him against the costs; but Shelby still remained defendant, and the persons to whom he conveyed, were never made parties. In this state of the case we have no doubt the testimony was properly rejected. No conveyance made by Shelby pendente lite could affect the title as to the complainants, and the executor of D. Mosby. As to them he still remained the owner of the estate. Besides, if they were successful, he was liable for costs in the first instance, and no indemnification given by another securing a refunding of these costs, could render him competent. His testimony being offered then for the purpose of proving that the estate for which he was sued, ought not to be affected by the decree, was properly excluded.
The objection to the deposition of Robert Mosby was of *508 another character. He was not party to the suit, nor had he any interest in the lands in contest. But he was the security of the complainant in the original bond for the purchase of the land, on which the judgement at law enjoined by this bill was formed, and was included in the judgement. If then, his residence proved the ancient boundary of the tract sold by D. Mosby's executor to the testator of the complainants to exist upon the ground, excluding the part claimed from Shelby, and making a deficit in the tract sold, (and for this purpose it was offered) it evidently tended to abate so much of the judgment against himself, and by relieving the complainant of the payment of the purchase money, he relieved himself of his accountability to the same extent, and this rendered him incompetent to depose against the executor of D. Mosby, defendant. We have not thought it necessary to enquire whether the objection lay in the mouth of the complainants who made it; for the executor of D. Mosby joined in it, and his objection was sufficient to reject the desposition.
In an injunction despensing the payment of money, the security of the complainant tho' not other wise interested, and no party to the injunction is not a competent witness for his principals.
Having disposed of this part of the evidence touching the boundary, we proceed to enquire, upon what remains, whether there were any, and if any, where the boundaries made to the purchase of Buntin from M'Bride? The original survey of Buntin's settlement, of which that purchase is a part, was bounded by elder surveys, to wit: on the west by two surveys of Bulger, on the north by the surveys of Azor Rees and Hubbard Taylor, on the east and south by said Taylor's survey of Bowman's land. The boundaries of these surveys as fixing the true position of Buntin's settlement, except that of Taylor, appeared to be conceded in this cause, and by fixing the most northern boundary of Buntin's settlement binding on Rees, presenting one corner on Bulger's, and the other on Taylor's lines, we have two boundaries of the purchase of Buntin from M'Bride, on which to construct the figure described in the survey of James Hord, and the deed from M'Bride's heirs to D. Mosby, in discharge of their ancestor's bond to Buntin. The question then remains, are we to extend the tract southwardly only as far as the line V W on Bilbo's plat, which is chosen by the court as most satisfactory, or to the line 45, running into the tract sold by Roberts to Shelby? To ascertain this, the true position of Hubbard Taylor's survey becomes very important. One party contends that the line I F is the true boundary, while the other insists up *509 on its extension to the line 1 2. About the northern boundary of Taylor there is no dispute, and the corners R & S appear to be truly fixed. We have no hesitation in deciding on the proof in favor of the line I F as Taylor's true southern boundary, and that the corners E and D are also really his. The existence of the lines and many of the corner trees now on the ground, corresponding with the grant, the long acquiscence in, and recognition of these boundaries as Taylor's, corroborated by the testimony of James Hord himself, who was the original surveyor, and who owned the contested land itself, and whose interest it was to swear otherwise, can leave no reasonable doubt as to the lines I F E D being the true corners of his survey, and that in making of his survey there has been a mistake which has lessened the quantity, and that his survey is not so broad from north to south as it was intented to be, and as the length of the lines called for in the patent makes it to be. This position of Taylor's lines is more clearly demonstrated by the fact which is incontestibly proved, that it was agreed by Taylor and M'Bride, that Taylor's southern boundary should run at equal distances from the two springs at 8 and 9 on the plat, and the surveyor in making Taylor's survey was instructed to execute that agreement, & did do so. Accordingly the line as now chosen by this court is found at equal distances from these springs. We cannot then see the propriety of so much of the decree of the court below as departs from the boundaries of Taylor at D E F, which are called for in the field notes of Hord, and in the deed from M'Bride's heirs to D. Mosby, and fixing upon the line 3 F as the proper line and corners called for in said decree and field notes, and leaving out the small parallelogram D E F 3. contrary to the express calls of the deed and field notes.
As was well observed in argument, the mistake being found to exist in Taylor's survey, by which the line D R is made shorter than the calls of the grant, it furnishes a clue, by which to ascertain the existence of, and explain the nature of the mistake made by James Hord in executing the survey of the purchase of Buntin from M'Bride. The line D E of Taylor of sixteen or eighteen poles, furnishes a point on the eastern boundary of that purchase as surveyed by Hord, which will determined at once on which of the points whether northwardly or southwardly the mistake in Hord's survey exists. To run from E to V the corner con *510 tended for by Shelby and Roberts as the ancient corner, the line is sufficiently long to comply with the field notes of Hord, and has ten poles and an half of surplus; to extend north to C, the line is too short, and plainly proves that the deficiency of the quantity exists on the northern part of the surveys made by Hord, where it cannot be made up because there it abuts itself against the original lines of Buntin’s settlement. Fixing then the point E confined to Taylor’s corner, and immoveable as it must be, and running west till the length of the line is obtained; the want of length to go further would be equally as conclusive, if not more so, that the line should stop at the distance and extend no further south, as the want of length in the parallel line B W would be, to extend it further to the figure 5 as the court below has done. And it ought, to be entirely conclusive that the survey should stop at V W if the ancient boundary exists there, which will be shewn presently, and not extended to the line 4 5 in violation of the call for Taylor’s short line D E, and there fix the boundary where neither line nor corner exists. One surveyor made the surveys of Taylor, Buntin’s settlement, and Buntin’s purchase part of that settlement, the two first officially and the latter a private survey, about the same period, and had the field notes of the first and second before the third was made. It is easy then to conjecture, and that conjecture is rendered highly probable, that having first made Taylor’s survey, and committed the error by some means or other in making Taylor’s line R D too short, he commenced Buntin’s settlement by running ninety poles from R to C, and there fixing the corner of Buntin’s settlement with Rees’ corner, and indeed he knew that he had fixed Rees’corner there at that distance previous to that time. By deducting the ninety poles from the whole length of Taylor’s line R D, as he had that length in his notes he left the distance of the line C D, where it was in fact much shorter, because the original length of Taylor’s line R D was mistaken and wrong in his notes.—He then at C might start Buntin’s settlement line west to B. and so proceed round Buntin’s settlement till he closed with Taylor’s southern boundary at G and then to F. He would then have the survey of Buntin’s settlement complete, and the error in the length of Taylor’s line would remain undiscovered, unless he run again the line D C which could not be thought necessary by any surveyor. In like manner when he surveyed Buntin’s land, now in contest. *511 he could readily, when furnished with all these field notes commence at the corner E and extend a proper distance to give the quantity of two hundred acres to V, on the mistaken supposition that the line D C was sufficiently long.—It was only necessary then to run the line V W across to Bulger’s line, and then close his survey, without running the line W B which would have detected the error. This conjecture is almost reduced to a certainty by his swearing, in answer to an interrogatory that he believes that was the mode in which he executed the survey of Buntin’s purchase. But the fact of the line V W being the true boundary is not left to this conjecture alone. The line itself there exists, and is anciently marked corresponding in course, distance and appearance with the ancient field notes. No line is found existing southwardly after considerable search to rival it; not even at the line 4 5 where the decree of the inferior court has fixed it. The corner tree, or rather one of the corner trees has been found and examined by the surveyor Thomas, in his suit, and it is proved by one witness at least that one of the corner trees existed at V. Add to this, that this line appears to have been long acquiesced in, and never appears to have been questioned by the successive owners Buntin, John Hord, James Hord himself the surveyor or who made it, and D. Mosby. On the contrary, Hord himself the surveyor, deposes that it included no part of the sycamore grove around the figure 4 in which the court below has fixed the corner; and he further states that he procured leave from the occupant south of that line to get sycamore timber in the grove, which it is now contended then belonged to him. A similar fact is also proved by another witness in the cause. This court then essentially disagrees with the court below in extending Buntin’s purchase beyond the line V W, and conceives that it would be improper to disturb an ancient boundary against such proof, after so great a lapse of time.
It being determined then, that the line V W as contended for by the defendants Roberts and Shelby, cannot be departed from as an ancient boundary, and that none other can be established as a corner of the deed to D. Mosby, we will proceed to consider this bill as one for a specific execution of M’Bride’s bond to Buntin, and enquire, whether, as there was a mistake in the survey, the chancellor can extend it so as to include the proper quantity. It is true that this bond is yet unfulfilled, and that one only of Buntin’s heirs conveyed *512 but half a title in discharge of it. It is equally true that the remainder of Buntin’s settlement is held to this day by half a title, one heir only having conveyed, and no purchase appears to have completed his title so that he might wholly avoid the effect of Buntin’s prior equity; can the survey then be extended and the bond filled up as to quantity? This will be best answered by a consideration of the bond itself. It does not leave the figure of the survey which is to be conveyed, by its terms subject to the election of either party; nor does it give any general description by which the bond can be moulded into shape by judicial construction. It at once fixes the survey or land to be conveyed to the boundaries “laid off by Mr. James Hord, deputy surveyor." Hord’s field notes then as to description, became a part of the bond, a necessary accompaniment to give it effect. These field notes, it has been determined have fixed the ancient boundaries, but through mistake they do not include the quantity: Can the chancellor then change these ancient boundaries, and make up the complement out of the adjoining lands? We are of opinion he cannot.—Chancery will enforce contracts that are fair and certain, and it will often rescind, them for mistake and fraud; but it will never make new contracts, or new model and add to those already made by the parties. Had the parties in the present instance discovered the mistake after their first contract was formed, in what manner would they have rectified it? This would have been, the subject of fresh negotiation and new contract between them, or it might have been the means of dissolving the old one by mutual consent.—They might have increased the quantity of land by an additional piece, and if they had done so, it cannot now be told from what figure they might have given it, by a bargain operating as an appendix to the original contract. All this it was competent for the parties to do by consent, but, such arrangement the chancellor cannot make for them. The question then arises, what redress can the parties have, when one of them seeks to enforce the contract, the mistake notwithstanding, so far as the land can really be obtained. The answer is easy. In such cases the chancellor will decree compensation for the defect, and enforce the original subject, and this we conceive is a case where that principle ought to be applied. But it is contended in this case, that, even if the land cannot be obtained, the executor of D. Mosby ought to recover the whole purchase money, because *513 the sale by him was made in gross of the whole tract, and in such case a deficit in quantity ought not to be supplied. It is true that this court has determined that, in cases of executed contracts, surplus shall not be recovered back, when the sale was made by the tract and not by the acre. In such case the party purchasing may readily be presumed to run the risk of deficiency and to disregard it in the stipulation. It would, therefore, be improper to disturb an executed contract, after he had waived the enquiry. But where the parties have both believed that there were two hundred acres in the tract, and it has been so represented at the sale, and owing to a hidden mistake long ago made, it is deficient in that quantity to so large an amount as the present survey, and the contract is executory, and the purchaser prays that it may be rectified in due time, we conceive it ought to be provided for by the chancellor, before he enforces the contract, as other losses and defects. The criterion of compensation between Smith’s heirs and D. Mosby’s executor next presents itself. It appears that the land sold for a sum, that if there had been the quantity supposed, the price would have been seven dollars and fifty cents per acre. The quantity lacking is thirty two acres, amounting to two hundred and forty dollars. The decree of the court below must therefore be reversed in favor of the defendants below Roberts and Shelby, and in favor of the complainants below likewise, and the cause remanded, with directions then to dismiss the bill with costs as to the defendants, Roberts, Shelby, Hamble, and Davis’ representatives, and that a decree be entered in favor of the complainants, for a credit on the judgment at law of two hundred and forty dollars, at the date the bond on which the judgment is founded commences bearing interest, and also the costs of this suit in the court below, to be deducted out of the sum enjoined herein, and then that the injunction be dissolved as to the residue enjoined, if any remain. It further appears, that the court below has decreed, that M’Bride’s heirs should convey not only the original boundaries, but the additional tract added thereto by the decree of that court, to Mosby’s executor, and that he should convey it to the complainants, the heirs of Horace Smith, and then retaining the cause on the docket as if the decree was interlocutory, when in fact, it ought to have been final so that either party might then appeal, has caused said, deeds, to be executed. This on the return of the cause must be *514 rectified, and the complainants in that court must be decreed to release back to M’Bride’s heirs, all the land added to their tract outside of the line V W. For as one of M’Bride's heirs never before conveyed this land, his title ought not to be given to the complainants. It is further seen in the cause that the court below has directed the heirs of the deceased defendant, M’Bride, to convey by guardian, or rather that their uncle as guardian shall convey the land for them. This is likewise deemed erroneous, for the conveyance ought to have been made by a commissioner, or commissioners appointed by the court, after a decree was rendered against the heirs. The complainant, therefore, will be entitled to such decree as will complete his title according to his contract, for all the land contained within the ancient boundaries of the field notes of Hord, as fixed by this court, and also his costs, and the defendants, Roberts, Shelby, Davis and Hamble, will be entitled to recover their costs of the complainants both in this court and court below, and the complainants must recover their costs in this court of the defendant, the executor of David Mosby.
Chancery will enforce contracts that are fair an certain, and it will avoid those which are fraudulent or built on mistake, but never Miter or modify them.
In executed contracts where lands are sold in gross, no allowance will be made for express or deficits, not so executory contracts, relief will be granted when the deficit was latent.
When a decreee is passed, ordering infants to convey, the conveyance should be made by a special commissioner, a by their guardian
Hardin for Shelby & al. Haggin and Talbot contra.
The only remaining difficulty is, with regard to the redress of the defendant, the executor of Mosby against M’Bride’s heirs. They seem as their ancestor’s bond has never been published, to stand liable to render compensation even to the complainants by direct decree, if the compensation to him was not already in his own hands. But their liability must remain as to Mosby’s executor for compensation, agreeably to the consideration received by their ancestor with its interest, and the costs which the executor of Mosby has expended and been made subject to in this suit. The executor has framed his answer in the shape of a cross bill for that purpose, and has prayed that relief. But they being in the attitude of co-defendants were not bound, as a complainant is, to take notice of such interrogations, and no process has been served upon them for that purpose, without which, a decree according to the principles adopted by this court in the case of Bibb vs Prather & Smiley, 1 Bibb 313—cannot be rendered against them. The court below is, therefore, directed to retain this branch of the cause, and to award process on the cross-bill, and sustain new proceedings thereon, as equity may require.